We have four R.E. cases this morning. The first is No. 21-2309, Dobyns v. United States. Mr. Reed. May I please declare James Reed for plaintiff appellant J. Anthony Dobyns. Good morning. I'd like to focus on the trial court's orders and its interpretation of the Equal Access to Justice Act, which are reviewed de novo. And because there were no decisions made on the merits of each application, we would submit that it may be viewed as a summary proceeding and reviewed de novo as well. I believe the most helpful thing I can do for the court this morning is to provide a brief chronology of the events that we believe told the filing deadline for the Plaintiff's Equal Access to Justice application for fees. On May 1st, 2019, the trial court issued an order of Appendix 240 for the parties to provide a status report by May 17th, 2019 as to any unfinished court business. On May 15th, 2019, the parties filed a joint status report of Appendix 435. Plaintiff stated that he was filing a petition for certiorari, after which he would file an each application for returning fees or, at minimum, defeating the government's counterclaims. Later that same day, May 15th, 2019, the trial court issued an order founded Appendix 241 for the parties to file a joint status report within 60 days of the final resolution of the plaintiff's request for relief from the Supreme Court, indicating their proposed schedules for further proceedings in this matter. On February 4th, 2020, the Supreme Court denied the petition for certiorari, and 25 days later, on March 20th, 2020, the Supreme Court's denial and the Federal Circuit's reversal of Plaintiff's trial victory became final. On April 20th, 2020, Counsel for Plaintiff and the government exchanged emails in which the Justice Department agreed that an amended judgment needed to be issued. The Justice Department said, quote, we don't need to ask the trial court to issue a new judgment, it will do that as a matter of course, and that's found in Appendix 74. On April 24th, 2020, the parties filed a joint status report found in Appendix 440. Plaintiff described again his intent to file an each application. On May 4th, 2020, the trial court issued an order stating that no amended judgment would be issued, and that's Appendix 242. The court noted that Plaintiff intended to file an application for attorney's fees under the Equal Access to Justice Act. The court ordered the parties to file by May 18th, 2020, quote, a joint status report proposing a schedule including specific calendar dates to go in further proceedings in this case, end quote. On May 18th, 2020, at Appendix 450, the parties filed a joint status report. The parties proposed August 17th, 2020, as a date for Plaintiff to file his previously described request for attorney's fees along with any other motions. Two days later, on May 20th, 2020, at Appendix 244, the trial court issued an order adopting the parties' proposed schedule, setting August 17th, 2020, as Plaintiff's deadline to file post-appeal motions, and commended the parties for working together to create this schedule. On August 14th, 2020, at Appendix 246, the court extended Plaintiff's filing deadline to October 16th, 2020, for good cause shown with consent by the government. Okay, I think we know what happened. Before getting into the merits of the equitable tolling... Very good, sir. I'll move there right now. Please go ahead. I'll move there right now. Well, I had a predicate question. Yes, sir. You seem to be claiming attorney's fees both with respect to the counterclaim, as to which I guess you were the prevailing party, but also on the merits of your own claim. And I'm not quite understanding how you were a prevailing party since you lost on your claim. You don't have the standard, and those are in the cases cited by Appellant's brief. The standard is to change the legal standing of the plaintiff as a result of prevailing. Now, Judge O'Reilly issued a number of findings of fact against the ATF. Those included that ATF intentionally exposed the plaintiff to danger by removing his covered identifications, obstructing the investigation of the arson of his home, and then wrongly charged him as a false suspect. There's no case that I'm aware of that suggests that that makes you a prevailing party. Your Honor, the cases that we cited indicated that an outcome which changed the legal relationship between the plaintiff and his employer is sufficient to obtain attorney's fees under EJIA. Now, granted that we did not win under the covenant of good faith and fair dealing, Your Honor, as you well know, as one of the authors of that opinion. However, after those findings of fact were issued, Agent Dobbins was no longer a suspect in this case. He was exonerated in a 55-page trial court opinion as an arson suspect, and he was no longer pursued. He was also characterized as a whistleblower. All of these things are vital alterations to his relationship with ATF. I understand your point. Why don't you go on to the equitable tolling issue? I'm sorry? Yes, sir. Yes, sir. Now, the trial court's orders dated May 15, 2019, May 4, 2020, and May 20, 2020, all caused plaintiff to reasonably believe the court had suspended and then extended plaintiff's time to file his EJIA application, as foremost among the further proceedings for which the court requested and then adopted a stipulated schedule of proceedings. Nowhere did the trial court try to exclude the plaintiff's future filing from the court's multiple references to, quote, further proceedings in its request for a scheduling order. The court did not do so until July 1, 2020. Excuse me, sir. You've got to listen a little bit better. Can I ask you this? Why would anything said by the trial court about scheduling that was actually said after March 20, 2020, matter? Your Honor, this order is March, that is, May 15, 2019. I know one of them, but you group all these things together. And it feels important for, I think, a pretty obvious reason to separate those statements, orders by the district court that came after the deadline passed from those which came before. Now, presumably, statements afterwards, if they were clear enough, might indicate that there was, in fact, a new deadline. But these don't quite do that. So which are the ones that preceded the running of the deadline, which I think you said was March 20, 2019? And why do those create a basis for equitable tolling? Your Honor, if I may, the judgment became non-appealable in final after the Supreme Court, after the petition for a hearing time expired before the Supreme Court on March 20. The 30-day period then, under the trial court's perspective, was April 19, not May. So it's a balance of spenders argument, Your Honor. There's two different reasons apart from the May 15, 2019 scheduling order. The agreement by the government, in writing in our brief, that an amended judgment would issue would start at the age of filing period at the date of issuance of the amended judgment. Right. So my recollection from reading these papers is that that passage in that email is far and away the most significant thing to think about. And I think what the claims court said about that was there was no kind of agreement in the sense of a contract between the parties, although it's unclear what the status of that would have been had it existed. It was rather one lawyer predicting something and another lawyer saying, OK, and the claims court said you weren't entitled to rely on that prediction. And as we specifically stated in the briefs, Your Honor, we did not claim that there was a binding oral agreement with the Department of Justice, nor did we claim that the Department of Justice was empowered to do that. What we claimed was that the Department of Justice had waived its right to object to the filing period for each opening prior to the date that they revealed that they were going to recant that requisition on April 24, 2020. Now, it does matter, and our decisions that we cite indicate that the government can waive those deadlines and waive its objection to object to those deadlines. The point being, then, if under Your Honor's perspective of this, and I respectfully disagree that the court's order governing further proceedings did not include Egypt, but if we go with Your Honor's perspective of this, that what matters is the predictions and the perspective of the Department of Justice, then April 24, 2020 was the date that the Egypt 30-day filing window opened. Now, just 10 days later, the trial court issued its order on May 4th specifically referring to plans to intent to file an Egypt application. That May 4th order renewed the court's May 15, 2019 request for the parties to stipulate to a schedule for post-appeal motions including the Egypt application. That order also indicated for the first time that no new judgment would issue. So up until that point, there was a common assumption between the two parties that an amended judgment would issue and that the Egypt filing window had not opened. Even if the trial court's May 4th order was found to start the Egypt filing period by announcing for the first time that no amended judgment would issue, the court then adopted the parties' filing schedule just 16 days later on May 20, 2020. And under the multiple decisions that are cited by plaintiff in the opening reply briefs, the government waived any timeliest objections when it attempted to recant its agreement that a new judgment would issue through to April 24, 2020. Again, just 10 days later, the court directed the parties to stipulate to a briefing schedule, and 16 days later, the court adopted it. Now, the decisions citing that waiver and tolling perspective include North Carolina Alliance, the Northern District of Ohio decision Vasquez v. Barnett, and the District of Kansas decision Olin House v. Commodity Credit Card. Now, the trial court in its May 15, 2019 order and in its May 20, 2020 order consistently used the term further proceedings to include plaintiff's Egypt application. And by those orders and by the trial court's subsequent orders granting plaintiff's consent motion to plaintiff's filing deadline, as August 17, 2020, which the court specifically did, the trial court suspended and extended the Egypt filing date. And at minimum, it should be found to have tolled it under equitable grounds. If somehow the trial court did not understand that it was doing so or that it was reasonable for the plaintiff to believe it was doing so, that is not the fault of the plaintiff, nor should it be to the prejudice of the plaintiff. And specifically, Your Honor, as we cite in our opening brief at page 37, the Middle District of North Carolina in the North Carolina Alliance for Transportation Reform v. Department of Transportation decision, in reviewing each of Section 2412d-1b motion for fees, wrote, the Supreme Court has recognized that a court may equitably toll a deadline when a court leaves the plaintiff to believe that he has done everything required of him. We could not have been more clear that we were filing Egypt application. We made it clear in our May 15, 2019 status report, and the court referred to all further proceedings as being subject to the court's, to the party's stipulated scheduling order. And Your Honor, as I was going to reserve three minutes for follow-up, I will just say that as for the 2412, now we've been talking about 2412d, as for 2412b, which is governed by Claims Court Rule 54, even the rule itself states this 30-day deadline can be modified by court order. And the U.S. Supreme Court decision in Scarborough v. Prince Phippie in 2004 made clear that 2412d-1b's 30-day deadline is subject to equitable tolling because the 30 days is not prejudicial. Finally, Your Honor, I did put in the briefs that the extraordinary interruptions due to COVID after March 20, 2020 made the production of the Egypt application impossible, either by April 19, 2020 or by May 4 or May 20, 2020. The time entries for the six years were housed at two prior law firms which had closed and were inaccessible during COVID. Each of these factors is an independent and sufficient reason to find plaintiff's Egypt filing deadline cold. And coupled with the absence of prejudice from plaintiffs being heard on the merits of this Egypt application, this we believe should guide the court to reverse the trial court's July 1, 2021 order denying attorneys fees and costs. And I'll reserve the last minute and a half for follow-up. Thank you, Mr. Reed. Thank you. Mr. DeMarli. May it please the Court, Your Honor, I've gotten so used to Room 201, there's a longer walk here. I have to bring everything up with me. Can't just turn around and grab them from the table. Apologize for that. So does the government agree that equitable tolling would be available both for the statutory deadline and the deadline in the rule? Well, Escargot does seem to say that because it's a statutory deadline and not a jurisdictional deadline, that equitable tolling is available. The Townsend case that's referenced in our briefing from the Sixth Circuit has found that equitable tolling is available. It ultimately denied it in the subsequent decision, but it does seem like that's where the jurisdictions are going, Your Honor, yes. Okay. So I'm a little puzzled as to the government's position as to why equitable tolling is not available here. I mean, the quintessential Supreme Court case on equitable tolling is Irwin. And Irwin gives us an example of a situation where someone is misled by an adversary. A case called Glouse, which is not cited by either party. It's 359 U.S. 231. And in Glouse, the Supreme Court held that where somebody had represented to the other party that the statute of limitations was seven years when it was a shorter period, that was sufficient to create equitable tolling. And I guess I'm looking at the facts of this case, and they seem to me to be somewhat similar to Glouse. So why, I mean, assuming my description of Glouse is accurate and equitable tolling existed where one party told the other that the statute of limitations was longer than it in fact was, why isn't that like this here? Well, if Your Honor, before I answer that question, which I 100% will, Your Honor, I do want to point this to the standard of review here for equitable tolling, which would be abuse of discretion. Largely, let's answer the question first. Yes, so we're looking into whether the trial court made an irrational judgment when it disagreed with that. What the trial court said was the parties can't extend the time by agreement. That's not a viable theory. I would disagree with that, Your Honor. That's not what the trial court said. Answer my question, okay? Yeah, I am, right now. Your Honor, that's not what the trial court said. No, not that question. It's the question about Glouse. Why isn't this like Glouse? Well, the trial court found that Mr. Dobbins identified that there was an extension of time based on the trial court's findings, or the trial court's rubbish, the ones predating and postdating, as Your Honor points out, as well as the statement from the DOJ counsel. So what the trial court found was the reason for the delay, when looking at that part of the excusable neglect test, was a misreading of those orders, as well as Mr. Dobbins should have done the research himself. So then you could say that about Glouse, too. I mean, here's one party saying to the other, the statute of limitations is seven years. The other party doesn't bother to look it up, and yet the Supreme Court says there's equitable tolling. Same thing here. You told him that there was no need to ask for an order, that the trial court would automatically issue a new judgment, which would start the period for the attorney's fees motion. Well, I think the government counsel in this case agreed with Mr. Dobbins about the amendment job. When you look at the statement and what it said, Your Honor, I think, and I don't want to just say it off the top of my head because I don't want to misrepresent it. So I'm going to jump back into the court decision here, Your Honor, and get it exactly. Well, it said, I don't think we need to ask the trial court to issue a new judgment. It will do that as a matter of course. Right. So what Mr. Dobbins, how he describes the situation is a mutual mistake effect, not relying on But he describes, he makes multiple arguments, one of which is that he was misled by his adversary, that is you, the Justice Department, okay? And you told him that there would, not you personally, but that there would be a new judgment which would start the time. That was wrong. Why isn't that sufficient for equitable tolling? Well, the question was whether there would be a new judgment. I'm going to move on so much, Mr. O'Rourke, but I'm going to skip that, Your Honor, and focus on this. What the trial court found was that especially after, it was like 10 years of hard fighting against the government, it was unreasonable for Mr. Dobbins to rely on a statement from government counsel in that case. This was an exceedingly friendly cooperative email. Correct. This was not. I will say absolutely nothing that creates the slightest risk of helping your case. Your Honor, and just to, you know, for my own sake, I've enjoyed working with Mr. Reed and there's been no issues. But at that time, the other motions that are mentioned in the trial court decision, the orders that are going to be filed, or attempts to seek criminal sanctions against government employees, civil sanctions against them, there was still a tension between these parties at this time. It wasn't all copacetic, even though the tone of the government's email there was very blunt, let's say. But the email misled him, didn't it? Well, I think the email didn't correct his misunderstanding because the email that was sent suggested that the trial court will enter a new judgment. We don't need to do anything. Correct. Because the premise of the mutual misunderstanding is that an amended judgment would be coming. Right, Your Honor? That there would be an amended judgment. There was a need for one. Mr. Dobbins' counsel suggested that and government counsel did not correct him because the government counsel. No, it's more than that. He actually told them that there would be no need for a new judgment because the trial court would enter one as a matter of course. I don't think we're disagreeing, Your Honor. So why isn't that sufficient to misleading behavior to qualify for equitable tolling? Well, Your Honor, as we said in our briefs, as the trial court said, which again this court is reviewing for a rational judgment, that it was Mr. Dobbins' responsibility to do his own research on this and not just trust a statement from government counsel on it. The way I think that Judge Dyke framed the point before is that what appears to have been the case is that the claims court relied on an incorrect legal proposition that an adversary's representation cannot be the basis for equitable tolling. That wouldn't be so much irrational as one ground for abusive discretion, which is reliance on an incorrect legal view. Right, I don't think the trial court goes that far, Your Honor. I was going to come up here and tell you today that nothing the government can say could ever cause equitable tolling. That's not our position. We didn't see this statement in particular as being problematic. As the court had pointed out, that there was a history between the parties, a contentious history. And also the statement itself, as I've discussed, Your Honor, I don't think there's a lot of difference between what we're saying, Your Honor, but the spin that we see on this is that the statement is not purposely pushing Mr. Dobbins in a direction he wasn't already going, but just failed to correct his mistake. Well, it did more than that. It said explicitly we don't need to ask for a new judgment because the court will automatically enter one. And if he trusted that. But he didn't, Your Honor. The record shows that. No. How does the record show that? Well, the record shows that on April 22nd. After the deadline. Correct, after the deadline.  Okay, Your Honor. So, yes, that is pointed out in the reply brief. This is three days too late, my thought process here. But it's relying on a letter from May 1st, 2019, Your Honor, where it shows that the trial court isn't going to do anything but terminate the case. So that letter has been sitting out for a while now. And that was, if I'm remembering correctly, appendix page 926. Is this the same as 240? Well, I was told in the e-mail it spelled for 230. I think that's correct if you want to go to the order, Your Honor. Yes. Right, but that doesn't say, does it, that once the clock runs on the Supreme Court process, there will be no need for any further action? That's the problem in this entire case. Nothing is explicit. And everything that we're going through here, Your Honor, has been very explicit. This is your deadline for your e-application, and that's why we're here today, right? Because the parties are interpreting these differently. But what the e-mail from April 22nd, 2020, shows is that Mr. Don has interpreted this letter as not doing anything, as saying that there wouldn't be amended judgment, that the case would just be terminated. How about the schedule of orders that the court adopted that mentioned the EJIA case, the EJIA application? Well, as the trial court said, there was nothing stopping parties from filing notions within their actual deadlines, that that 60-day deadline for the JSO was to deal with numerous things that were going to be filed, like the criminal notions that I mentioned and the sanction motions. So the trial court found that basically a party should be doing research, figuring out what the deadlines are, and filing appropriate motions when they're due, and not just waiting for the JSO. If Your Honor— Yes, I'm not sure if Klaus was decided incorrectly. You're right that the parties didn't address Klaus, so I'm not familiar with his facts. I apologize for that. Well, I gave you the facts. They told him there was seven years. And you could just as easily say, well, you should have done your own research to figure out why there wasn't seven years. Yes. I mean, I don't know what to say, Your Honor, because, as I said, I'm not familiar with, let's say, all the facts of that case. But the facts here show that from this order in 2019, there was doubt that their case would have an amendment judgment, that there would just be a termination, and that carried out in April 22, 2020, which, Your Honor, points out three days after the deadline, that Mr. Dobbins was interpreting that order from the year before as the case would just be terminated, no amended judgment. Am I remembering correctly or incorrectly that the first assertion by the department that a fees application would be untimely came after the deadline ran? To the court, yes. That wasn't the case at that time. I'm not sure what happened between April 8 and April 19. There's nothing in the record to suggest that you raised the timeliness issue. Well, it's not to the court, Your Honor, but it does not make sense to suggest that. Not to your adversary either. I don't know, Your Honor. I mean, the record shows that you did. Correct. That's what I was trying to say, Your Honor, that there's nothing to show that in between those two time periods what happened. But there was some discussion, because by the time the JSR came out, if you read the position of the plaintiff appellant in that JSR, they were aware of the government's timeliness argument. So there was some discussion at some point. I just don't know the date, Your Honor. It's not in the record. Your Honor, my time is low here. I would want to just address your preliminary question that you mentioned about the change in legal relationship and can there be EJ in a prevailing party. And this is, of course, Your Honor's Mayor, this is not something that was briefed because the trial court didn't reach this. But our review of the case law is that there needs to be a change in the legal relationship that directly benefits the party. And it was on the counterclaim, right? It was on the counterclaim. We also haven't found a case where a party lost on its claim, won on a counterclaim, and got EJ fees either. So the case that cited United Construction as being able to get EJ fees on a counterclaim, they have a prevailing party on their own claim as well. Here, Mr. Donovan sought ultimately $17.2 million on his affirmative claim after some amendments, and after this court's decision got $0. So he's going to run into a prevailing party issue. He's also going to run into a substantially justified issue because the Commissioner INS Eugene case says that you need to look at holistically an entire case to determine whether or not the government is substantially justified. This is a contract case where Mr. Donovan sought $17.2 million, and he got $0. And, yes, he defeated the counterclaim. How much was the government seeking in the counterclaim?  I apologize, Your Honor. But looking at the totality, holistically, not substantially justified. There's nothing the government could have done. There's no wiggle room between the $0 and $17.2 million. What? I don't understand what you're saying. It may not be entitled to $17 million, but maybe they spent $100,000 in defending against the counterclaim or something like that. Well, I was talking about the main issue, Your Honor. $17.2 million is on the main issue, the affirmative case for Mr. Donovan. How much do you seek out of the counterclaim? Your Honor, just ask. I can't reveal that much. Yeah, yeah, yeah. I thought they were settled for a certain amount. There's no settlement in this case. There's no settlement? That's correct. The United States lost the counterclaim, and Mr. Donovan lost his affirmative claim. That's been two months this year. Okay. But to be clear, I was asking a different question than Judge Delano was asking. I thought he was asking what the amount of the counterclaim at Amnon was. I'm asking how much attorney's fees did they spend in defending against the counterclaim. So this was briefed below, and I think that Mr. Donovan's counsel did an aggregated job of trying to parse through and figure out what his attorney's fees were for the counterclaim. But the United States did point out that it's speculation, in our opinion, that it's too hard to tell what attorney's fees were spent on what. What did he say were the attorney's fees attributable to the counterclaim? Well, if I'm remembering correctly, Your Honor, the application is actually on the record here. Oh, that's all right. I just found the page if you want to look at it. So it looks like it's 512. And then towards the end of it is where he discusses quantum. And there's some numbers going back and forth, but the fees incurred to date were something like 731,000. And it says 146,399 related to the government's counterclaim and Donovan's defenses there, too. So I would say about 147,000, Your Honor. Okay. Thank you, Mr. Reed. Thank you, Your Honor. Mr. Reed. Thank you, Your Honors. I'll clean up some issues that the Court asked about. First of all, in terms of whether or not there is a case awarding a counterclaim success attorney's fees under EJF, that's cited at page 49 of our opening brief. That's United Construction Company v. United States, where the federal courts have found severable positions to entitle a prevailing defendant to a prorat award of attorney's fees under EJF for defeating a counterclaim. With respect to how much the government sought under its counterclaim, it sought a regurgitation of the movie contract and the book royalties totaling approximately a half a million dollars. With respect to whether or not the government can be stopped or found to have waived an objection to the timeliness of an EJF application, that is the Olin House decision, which we cite at page 19 of our reply brief, and it is the North Carolina lines decision that we cite at page 37 of our opening brief. Now, with respect to the April 22 email, the Court asked whether there was anything in the record that the government changed their position prior to April 24. Not only is there nothing in the record, and as the trial attorney, I can vouch for that, but the timeliness issue is not raised until April 24, and the April 22 email confirms that, that that was still the understanding of the parties. Now, this is not an issue of research. It is a matter of when the EJF window would open, and that would be at the earliest on May 4, 2020, when the trial court stated that no amended judgment would issue, and our position is that the Court then adopted the schedule of the parties in less than 30 days after that. Okay. Thank you, Mr. Reed. Thank you, counsel. The case is submitted.